STATE OF NORTH CAROLINA v. FRED THOMAS McKINNEY, JR.

No. 1

(Filed 7 March 1978)

1. **Criminal Law § 87.2— conversation with district attorney — redirect examination — opening door on cross-examination**

   Where defense counsel, on cross-examination of a State's witness, elicited the information that the witness had talked to the district attorney on the preceding day for five or ten minutes, the witness was properly permitted on redirect examination to state the nature of her conversation with the district attorney, the defendant having opened the door for such testimony.

2. **Criminal Law § 73.4— narrative of observed conditions**

   In this homicide prosecution, testimony by defendant's companion that, immediately after the shooting, he tried to talk to defendant's sister-in-law and "she couldn't talk" but just sat there in the car screaming was simply a narrative of observed conditions substantially contemporaneous with the shooting and was properly admitted in evidence.

3. **Criminal Law § 96— repetition of excluded evidence by judge**

   In a prosecution of defendant for the murder of his wife, the court did not err when, after sustaining a motion to strike a deputy's testimony that defendant told him that he would kill the officer too, and while considering a motion for mistrial, the court repeated the excluded testimony in readvising the jury that the deputy's testimony which defendant had moved to strike should not be considered and ascertaining that members of the jury would follow the court's instruction not to consider it.

ON certiorari to the Superior Court of TRANSYLVANIA to review the judgment of *Griffin, J.,* entered at the October 1976 Term, the defendant's appeal, as a matter of right, not having been perfected within the time allowed by law.

Pursuant to an indictment, proper in form, the defendant was charged with the murder of his wife, Georgia Nadene Smith McKinney. Upon a verdict finding him guilty of murder in the second degree, he was sentenced to imprisonment for life.

The defendant offered no evidence. That for the State, if true, was sufficient to show:

Defendant and his wife were living separate and apart. Their frequent communications were generally acrimonious. During the evening and until approximately midnight on 18 June 1976, the defendant's wife and his sister-in-law, also separated from her husband, were riding about in a car driven by his wife. Earlier in

the evening, they passed the house of Beatrice Barton and observed the defendant there. Shortly thereafter, the defendant went to the home of his mother, some 300 yards distant, went into a bedroom and fired a shotgun out of the window. At that time the automobile driven by his wife was again passing the houses of Beatrice Barton and his mother. Due to the elevation of the road above the house of the defendant's mother, a shot fired from the house would not have endangered the car or its occupants. Earlier that day the defendant and his wife had had a telephone conversation, the nature of which is not shown in the record.

The defendant and his companion, Chester Van Bracken, having previously been riding about together and drinking, followed the automobile in which the defendant's wife and sister-in-law were riding, Bracken driving and the defendant carrying a shotgun. Either by prearrangement or otherwise, the automobile occupied by the women stopped and that occupied by the men drove up and stopped nearby. The defendant got out of the car in which he was riding, called to his wife saying he wanted to talk to her, and walked over to her car carrying his shotgun. Before leaving his car, the defendant told his companion he was going to drag his wife out of her car and beat her, whereupon the companion, saying he did not want any part of the defendant's family arguments, got out of the car and started walking to his own home which was not far away.

The defendant went to the car occupied by the women, loaded and unloaded his shotgun several times and, while standing in front of the car, pointed the gun between the two women saying, "I have a good mind to blow both of youns damned head off." His sister-in-law told him to put the gun down. Continuing to hold it, he came around to his wife's side of the car and told her to roll the window down so he could talk to her. She rolled it down but then rolled it back up. He then opened the door and leaned against the inside of the door and they began to talk. His wife told him to put the gun down, whereupon he became angry and threw it down onto the road, breaking off a part. He then told his wife to fix the gun for him. However, he attempted to fix it himself and then asked his wife if she wanted the gun. When the women did not take it, he said he would keep it and fix it himself. Thereupon, he reloaded the gun. After further conversation he said to his wife, "I have just a good mind to kill you." She replied,

"You might as well kill me now as any time," to which he responded, "By God, I will." He thereupon stepped back, pointed the gun at his wife's head and fired it. One side of his wife's head was blown off and virtually her entire brain was blown out of her skull.

The defendant's companion, hearing the shot and the shouts of the defendant, returned. The defendant asked him to help him and to see if his wife was dead. The defendant then stopped a passing motorist and asked him to call an ambulance and the police. When the police arrived the head and upper portion of the wife's body were in the roadside ditch with her feet still in the car.

The defendant tried to get his companion to take the gun but the companion refused to do so. The officers found it in bushes some little distance from the scene of the shooting.

Before the officers arrived, the defendant said to his companion, "Look at my wife and tell me she's not dead." In her statement to the officers, the defendant's sister-in-law said that immediately after the shooting she, the sister-in-law, started screaming for help and then "went blank" and when she regained consciousness she heard the defendant screaming and saying, "I didn't mean to hurt you, honey." Blood and fragments of the wife's skull were thrown by the force of the gunshot onto the sister-in-law's face. The record does not make it clear whether the defendant's last above quoted remark was directed to the sister-in-law or to the wife.

*Rufus L. Edmisten, Attorney General, by Myron C. Banks, Special Deputy Attorney General, and Marilyn R. Rich, Associate Attorney, for the State.*

*Jack H. Potts for defendant.*

LAKE, Justice.

In his brief, counsel for the defendant states that he has examined the record at great length and on many occasions and is unable to cite any authority to the effect that the errors alleged by him were prejudicial so as to warrant a new trial. He requests this Court to review the case to ascertain whether prejudicial error occurred in the trial of the defendant. Due to the nature of

State v. McKinney

the crime of which the defendant has been convicted and the sentence imposed, we have done so. We, like counsel for the defendant, find no error.

Three assignments of error are brought forward into the brief for our consideration: (1) There was error in permitting the sister-in-law, a witness for the State, to testify to a conversation she had with the district attorney; (2) there was error in permitting the defendant's companion, a witness for the State, to testify that, upon his return to the scene, he tried to talk to the sister-in-law and "she couldn't talk" but just sat there in the car screaming; (3) the court erred when, after sustaining a motion to strike certain testimony of the State's witness Whitmire, and while considering a motion for a mistrial, the court repeated that testimony to the jury. There is no merit in any of these assignments.

[1] On cross-examination of the sister-in-law, defendant's counsel elicited the information that she had talked to the district attorney on the preceding day for five or ten minutes. On redirect examination, over objection, the witness was permitted to state that the extent of the conversation was that the district attorney asked her if the statement she had given the police officers was the truth, she replying that it was to the best of her knowledge, and, thereupon, the district attorney told her that, when she was called to the witness stand, she should just tell the truth as to what happened and what she saw and nothing else. The defendant, having opened the door, there was no error in permitting the State, through this witness, to show the nature of the conversation.

[2] The comment by the defendant's companion as to the condition of the sister-in-law immediately after the shooting and her inability to talk, other than just screaming, was simply a narrative of observed conditions substantially contemporaneous with the shooting. There was obviously no error in the admission of this testimony.

[3] The State's witness Whitmire, a deputy sheriff who went to the scene of the shooting in response to the call to the police for assistance, testified that when he arrived at the scene, dressed in his uniform, the defendant seemed to be hysterical, was crying and had what appeared to be blood on his shirt and hand, that the

State v. McKinney

witness tried to calm the defendant down and was under the impression that there had been an automobile accident, and that the defendant said to the officer that his wife was over there dead and he, the defendant, would kill the officer too.

The record does not show the question in response to which this testimony was given. It shows that there was no objection entered until after the testimony and, thereupon, the defendant moved to strike. Assuming that the testimony was responsive to questions asked by the district attorney, the failure to object prior to the answer of the witness would waive any right to object. *State v. Edwards*, 274 N.C. 431, 163 S.E. 2d 767 (1968); Stansbury, North Carolina Evidence (Brandis Rev.), § 27. The court, nevertheless, sustained the motion to strike.

Thereupon, the defendant moved for a mistrial on the ground that the district attorney knew the witness would so testify. In the absence of the jury, the defendant's counsel was permitted to examine this witness further and the witness stated that he had advised the district attorney as to the nature of the testimony which he would give if called as a witness. The court then brought the jury back in and reminded the jury that he had sustained the motion to strike testimony to the effect that the defendant wanted to shoot this witness. The court then asked the jurors if they could abide by their oath and disregard that testimony pursuant to the court's instruction. No juror having indicated that he or she could not so disregard that stricken testimony, the court denied the motion for a mistrial. In this there was no error. The court was merely readvising the jury that the testimony of this witness which the defendant had moved to strike should not be considered by them at all and ascertaining that the members of the jury would, indeed, not consider it.

Although there is no error assigned to the charge of the court, we have carefully considered the entire charge and find therein no error.

No error.