STATE OF NORTH CAROLINA v. CHRISTINA SHEA WALTERS

No. 548A00

(Filed 2 May 2003)

**1. Appeal and Error— preservation of issues—motion for change of venue**

Although defendant contends the trial court erred in a case involving two first-degree murders and nine other felonies by failing to order a change of venue, this assignment of error was not preserved under N.C. R. App. P. 10(b)(1), because: (1) N.C.G.S. § 15A-952 provides that a motion for change of venue must be made prior to trial unless the trial court, in its discretion, permits the motion to be filed at a later time; and (2) defendant did not move for change of venue prior to trial as required under N.C.G.S. § 15A-957 or at any subsequent time.

**2. Jury— special venire—pretrial publicity**

The trial court did not abuse its discretion in a case involving two first-degree murders and nine other felonies by failing to order ex mero motu a special venire based on pretrial publicity, because: (1) each juror about whom defendant complains indicated that he or she would be fair and impartial and decide the case on the evidence that was presented; (2) the jurors indicated that they would disregard any information they heard or read prior to the trial; and (3) with regard to two of the jurors about whom defendant complains, defendant had no objection and specifically stated that these jurors were acceptable.

**3. Homicide— first-degree murder—short-form indictment—constitutionality**

The short-form murder indictment used to charge defendant with first-degree murder was constitutional.

**4. Criminal Law— joinder of offenses—motion for severance**

The trial court did not err in a case involving two first-degree murders and nine other felonies by granting the prosecutor's motion for joinder of the murders and related charges regarding the three victims, because: (1) N.C.G.S. § 15A-927(a) provides that a defendant must make a motion for severance of offenses before trial unless the basis for the motion is a ground not previously known, and any right to severance is waived by failure to

renew the motion; and (2) in the instant case not only did defendant fail to renew a motion for severance, but defendant failed to make a motion for severance at any time before, during, or after the trial.

### 5. Judges— leaving bench during recess—failure to show prejudice

The trial court did not err in a case involving two first-degree murders and nine other felonies by leaving the bench during a recess in jury selection proceedings even though a member of the media allegedly spoke with a prospective juror during this time, because: (1) defendant failed to cite any authority that would lead to the conclusion that the trial court erred in leaving the bench; (2) even assuming *arguendo* that it was error, defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and it cannot be concluded that a different result would have been reached at trial when defendant has provided no evidence that the media member said anything to the prospective juror that would prejudice the case, defendant provided no evidence that the prospective juror said anything in response to the media member's comment, and the transcript shows only that the bailiff immediately interrupted any inappropriate contact between the prospective juror and the media member; and (3) defendant's alternative argument for plain error analysis applies only to jury instructions and evidentiary matters.

### 6. Jury— challenge for cause—failure to exhaust peremptory challenges

Although defendant contends the trial court erred in a case involving two capital first-degree murders and nine other felonies by denying defendant's challenge for cause of a prospective juror, thereby causing defendant to exercise a peremptory challenge, defendant failed to preserve this issue for appellate review because: (1) defendant has not met the requirements of N.C.G.S. § 15A-1214(h) when defendant did not exhaust all of her peremptory challenges and acknowledges that she did not seek additional peremptory challenges; and (2) although defendant included plain error as an alternative in her question presented, she did not specifically argue or give support in her brief as to why plain error analysis was appropriate.

STATE v. WALTERS

[357 N.C. 68 (2003)]

**7. Appeal and Error— preservation of issues—failure to provide authority**

Although defendant contends she received ineffective assistance of counsel in a case involving two first-degree murders and nine other felonies based on her counsel's failure to challenge three prospective jurors for cause or to assert an additional peremptory challenge, this assignment of error is overruled because defendant failed to provide any authority or support for this claim.

**8. Evidence— prior crimes or bad acts—cross-examination**

The trial court did not err in a case involving two first-degree murders and nine other felonies by denying defendant's motion for disclosure of N.C.G.S. § 8C-1, Rule 404(b) evidence to be introduced by the State and by allowing cross-examination of defendant about certain prior bad acts, because: (1) there is no requirement that the State must provide a defendant with Rule 404(b) evidence that it intends to use at trial; (2) the State cross-examined defendant about the acts and did not directly introduce or use evidence of prior crimes or bad acts committed by defendant; (3) the trial court specifically asked defense counsel whether he wanted to object, and defense counsel stated that he had no problem with the questioning at that point in time; and (4) there was no plain error since defendant has not established any alleged prejudicial error on the part of the trial court that was so fundamental that the jury would have reached a different result absent the foregoing testimony.

**9. Appeal and Error— preservation of issues—failure to file motion to suppress—failure to object**

Although defendant contends the trial court erred in a case involving two capital first-degree murders and nine other felony convictions by admitting evidence from the hotel room where defendant was apprehended, this assignment of error is overruled because: (1) there is no evidence in the transcript or record where defendant filed a motion to suppress this evidence prior to trial; (2) defendant has not cited to any place in the transcript where she objected to the introduction of this evidence at trial; and (3) although defendant cites plain error as an alternative, defendant has not specifically argued or given support in her brief as to why plain error is appropriate in this situation.

STATE v. WALTERS

[357 N.C. 68 (2003)]

### 10. Evidence— defendant shot the victim—opening the door

The trial court did not err in a case involving two first-degree murders and nine other felonies by overruling defendant's objection to the prosecutor's cross-examination of defendant about a statement made by defendant to a detective that she shot one of the victims, because: (1)defendant testified during her own defense that she gave two statements to two different detectives regarding the shooting of the victim, in the second statement defendant said that she did not shoot the victim, and defendant then testified on direct examination by her own attorney that the second statement was false; and (2) this was the same testimony that the prosecution elicited on cross-examination, and the prosecutor was entitled to question defendant about this evidence since defendant opened the door to this testimony.

### 11. Evidence— hearsay—911 tape—witness statement—prior consistent statement exception—corroboration

The trial court did not err in a case involving two first-degree murders and nine other felonies by overruling defendant's objection to the admission of a portion of a prior statement by a witness made to a detective and portions of the witness's telephone call to a 911 operator, because: (1) the 911 tape and the statement were admissible for the purpose of corroborating the witness's earlier testimony at trial, and any variation goes to the witness's credibility; and (2) defendant was tried alone and not jointly, the witness took the stand and was available for a full and effective cross-examination, and thus the rule in *Bruton*, 391 U.S. 123, has no applicability to the facts of this case.

### 12. Appeal and Error; Sentencing— capital—preservation of issues—mitigating circumstances—instructions—failure to object—plain error analysis

Although defendant contends the trial court erred in a capital sentencing proceeding by giving its instructions regarding mitigating and aggravating circumstances, this assignment of error is overruled because: (1) defendant did not preserve under N.C. R. App. P. 10(b)(2) this issue for appeal since she failed to object to this sentencing instruction at trial; and (2) there was no plain error since there is no need for the trial court to specifically state the distinction between statutory and nonstatutory mitigating circumstances with respect to value, and the trial court does not need to instruct the jury on how to weigh statutory mitigating cir-

cumstances versus nonstatutory mitigating circumstances when all mitigating circumstances are weighed against all aggravating circumstances.

**13. Appeal and Error— preservation of issues—reference to entire transcript—particular error**

Although defendant contends she received ineffective assistance of counsel in a case involving two capital first-degree murders and nine other felony convictions, defendant failed to preserve this issue for appeal because: (1) N.C. R. App. P. 10(c)(1) provides that an assignment of error is sufficient if it directs the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references; and (2) a reference to the entire transcript is not a reference to a particular error nor is it clear and specific.

**14. Evidence— photographs—motion to exclude**

The trial court did not abuse its discretion in a prosecution for two first-degree murders by denying defendant's motion to exclude two photographs of the victims, because: (1) the first photograph of one victim was used to identify that victim, and the presence of a fly on the victim's eyelid was not so gruesome as to require its inadmissibility; and (2) the second photograph showing the bodies of both victims lying in a field was not unduly prejudicial or gruesome under N.C.G.S. § 8C-1, Rule 403, and offered a different perspective than that shown on another photographic exhibit.

**15. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel murder**

The trial court did not err in a case involving two capital first-degree murders by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murders were especially heinous, atrocious, or cruel, because: (1) the victims were subjected to at least an hour and a half of psychological torture by being trapped in the trunk of a car while pleading for their lives; (2) the victims were also abducted at gunpoint and robbed of jewelry; and (3) one victim was forced to witness her friend being shot in the head.

**16. Criminal Law— prosecutor's argument—personal attack—name-calling**

Although one of the State's closing arguments in a case involving two capital first-degree murders and nine other felony convictions that consisted of a rambling disjointed personal attack on defendant filled with irrelevant historical references and name-calling was close to mandating reversal, our Supreme Court was constrained by the lack of objections by the defense counsel, the lack of intervention by the trial judge, the limited number of questions presented on appeal, and defendant's failure to properly assign error.

**17. Criminal Law— prosecutor's argument—comparing defendant and gang members to Adolph Hitler**

The trial court did not abuse its discretion in a case involving two capital first-degree murders and nine other felony convictions by failing to sustain defendant's objection to the State's improper closing argument comparing defendant and her fellow gang members to Adolph Hitler, because: (1) given the overwhelming evidence of defendant's guilt, it cannot be said that the prosecutor's remarks were of such magnitude that their inclusion prejudiced defendant; (2) this argument which came after two proper arguments by the district attorney and an assistant district attorney most likely had little, if any, impact on the jurors' decision on the issue of guilt or innocence; and (3) the argument appears far more incomprehensible and disjointed than powerful and persuasive.

**18. Criminal Law— prosecutor's argument—request to do justice—hypothetical reference to encountering victims hereafter—reference to God**

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's closing argument that allegedly referred to the jury's solemn duty to the victims to do justice and that referred to the jurors confronting the victims in the hereafter, because: (1) the prosecutor did not imply that the jury's duty was to sentence defendant to death under God's law; (2) the remarks were not a biblical argument, nor were they based improperly on religion when the statements constituted a request to do justice and a hypothetical reference to encountering the victims in the hereafter; and (3) in making references to God, the prosecutor challenged defendant's direct tes-

timony in the guilt-phase that she had found God and a social worker's testimony in the sentencing phase.

**19. Criminal Law— prosecutor's argument—weight of mitigating circumstances**

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's closing argument that defendant's mitigating circumstances were excuses for the murders committed and that challenged the weight of defendant's mitigating circumstances, because: (1) the prosecutor simply contended that the jury should not give weight to defendant's mitigating circumstances; and (2) a prosecutor is permitted to legitimately belittle the significance of mitigating circumstances.

**20. Criminal Law— prosecutor's argument—biblical reference**

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's closing argument involving a biblical reference, because: (1) the prosecutor did not argue that the Bible commanded that defendant be put to death, but instead used the statement in question to respond to defendant's testimony that she did not want her children in the Davis Street environment; and (2) the prosecutor used this colloquy to amplify defendant's bad parenting and to attempt to eliminate any sympathy the defense might try to invoke with the jury based on the fact that defendant had children.

**21. Criminal Law— prosecutor's argument—failure to call witnesses**

The trial court did not err in a case involving two first-degree murders and nine other felonies by failing to intervene ex mero motu during the State's closing argument that defendant failed to call various witnesses to the stand, because: (1) the prosecutor was merely arguing that defendant had witnesses available who could have offered exculpatory evidence but that defendant had refused to call those witnesses; and (2) the prosecutor was also responding to defendant's assertion in which her attorney said to the jury that they tried to let the jury hear the whole story of what happened in this incident.

**22. Sentencing— capital—death penalty proportionate**

Sentences of death imposed upon defendant for two first-degree murders were not disproportionate, because: (1) defend-

**STATE v. WALTERS**

[357 N.C. 68 (2003)]

ant was convicted of both counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule with the two underlying felonies of kidnapping and robbery with a firearm; (2) the jury found the existence of four aggravating circumstances; and (3) the two murder victims and a surviving victim all endured an extended period of terror.

Justice BRADY did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Judge William C. Gore on 6 July 2000 in Superior Court, Cumberland County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 4 October 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to her appeal of additional judgments. Heard in the Supreme Court 14 May 2002.

*Roy Cooper, Attorney General, by Jill Ledford Cheek, Special Deputy Attorney General, for the State.*

*Andrea Michelle FormyDuval and Steven E. Williford for defendant-appellant.*

ORR, Justice.

Defendant, Christina Shea Walters, was indicted on 4 January 1999 for two counts each of first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon, as well as one count each of conspiracy to commit first-degree murder, conspiracy to commit first-degree kidnapping, and conspiracy to commit robbery with a dangerous weapon. In a second multicount indictment issued 25 January 1999, defendant was also indicted for attempted first-degree murder, conspiracy to commit first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, first-degree kidnapping, and robbery with a dangerous weapon. Defendant was tried capitally, and the jury found her guilty of all charges, specifically finding her guilty of both murders on the basis of premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death for each of the murders, and the trial court entered judgments accordingly. The trial court also sentenced defendant to consecutive terms of imprisonment for each of the nine other felony convictions.

The State's evidence at trial tended to show that defendant was one of nine gang members who set out to steal a car on the evening of 16 August 1998. The gang members included defendant, Francisco Tirado, Eric Queen, John Juarbe, Ione Black, Tameika Douglas, Carlos Frink, Carlos Nevills, and Darryl Tucker. The gang members gathered at and then left from defendant's residence, a trailer at 1386 Davis Street in Fayetteville, North Carolina. All nine gang members were "Crips" but of varying subgroups called "sets."

The gang needed money, and the members decided they would steal a car, drive it into the window of a pawn shop, and steal the property in the pawn shop. Several gang members, including defendant, went to the local Wal-Mart to steal some toiletry items and clothing, and to buy bullets for the occasion. The bullets were taken to the Davis Street trailer, where Tirado painted the tips blue, the color identified with the "Crips" gang, with fingernail polish from defendant's bedroom.

Soon thereafter, defendant and an unidentified deaf black male who was not part of the gang drove Douglas, Black, and Nevills to a neighborhood location and dropped them off with instructions to find a victim to rob, to steal the victim's car, to put the victim in the trunk of the car, and then to return to defendant's trailer within an hour and a half. Defendant provided Nevills with a gun, and then she and the deaf black male drove away, leaving Douglas, Black, and Nevills.

The three gang members walked around looking for someone to rob, and at about 12:30 a.m. on Monday, 17 August, they spotted Debra Cheeseborough leaving the Bojangles where she was the manager. Douglas, Black, and Nevills abducted Cheeseborough at gunpoint and drove around in her car with her in the backseat for a period of time before they stopped the car and put her in the trunk, also robbing her of her jewelry and money. They returned to defendant's trailer, where the remainder of the gang gathered around the car while discussing what to do with Cheeseborough.

Thereafter, with Cheeseborough still in the trunk, defendant, Douglas, Frink, and Queen got into Cheeseborough's car and drove her to Smith Lake, a location on the Fort Bragg military base. Defendant told Cheeseborough to get down on one knee. Defendant attempted to fire the gun at Cheeseborough, but it jammed. Defendant said "hold up" and tried to unjam the gun. Defendant then raised the gun again, this time to the level of Cheeseborough's waist, and fired the bullet into Cheeseborough's right side. After the shot

knocked Cheeseborough down onto her stomach, defendant shot her seven more times. The final shot went through Cheeseborough's glasses, grazed her eyelid, and hit her thumb. Cheeseborough pretended to be dead. She was discovered the next morning by a passerby and was subsequently taken to a hospital.

Debra Cheeseborough testified that no one told defendant to shoot her, the gun jammed before any shots were fired, it was defendant who told her to go down on one knee, there was no break in the firing of the bullets sufficient for defendant to have handed the gun to any other person to shoot her, and it was defendant who shot her.

After defendant shot Cheeseborough and left her for dead, the gang members returned to defendant's trailer, where they concluded that they needed a second car. Tucker, Black, Queen, and defendant rode around in Cheeseborough's car, ultimately targeting a car driven by Susan Moore in which Tracy Lambert was a passenger. The gang trapped Moore's car at the end of a dead-end road, and defendant handed a gun to Tucker, telling him to "go do what you got to do." Defendant, Frink, and Queen then drove away in Cheeseborough's car after Queen directed Black, Tucker, and Douglas to be back at defendant's trailer in forty-five minutes.

Tucker and Douglas forced Moore and Lambert into the trunk at gunpoint, and then Black, Tucker, and Douglas returned to defendant's trailer with the women in the trunk. At one point during the drive, the car was stopped so that the gang members could open the trunk and rob the women of their jewelry.

Upon the return to defendant's trailer, the entire gang surrounded the car and discussed who would kill the women. Despite the women's pleas for mercy, the entire gang, half in Cheeseborough's car and half in Moore's car, drove to a location in Linden where the women were forced out of the trunk and executed, each by a blue-tipped bullet to the brain. Queen shot one of the women, and Tirado shot the other. The gang members once again returned to defendant's trailer.

After talking for awhile, the group split up, with instructions from Tirado to return by 3:30 p.m. Sometime around dawn, Frink called defendant with news that some bodies had been found. Seven members of the gang, including defendant, subsequently fled to Myrtle Beach using Moore's cell phone to place calls to defendant's trailer. Black and Nevills did not accompany the gang to Myrtle Beach.

On Tuesday, 18 August, Juarbe and Tucker were apprehended in Cheeseborough's car by Myrtle Beach police officers. On Wednesday, 19 August, defendant, Frink, Douglas, Queen, and Tirado were apprehended and arrested at the Bon Villa motel in Myrtle Beach in a room rented by defendant.

Additional facts will be presented as needed to discuss specific issues.

**[1]** In defendant's first question presented before this Court, she contends that the trial court committed reversible error, or in the alternative plain error, in failing to order a change of venue or in failing to order a special venire, thereby depriving defendant of a fair and impartial trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

First, defendant did not move for change of venue prior to trial as required under N.C.G.S. § 15A-957. Pursuant to N.C.G.S. § 15A-952, a motion for change of venue must be made prior to trial, unless the trial court, in its discretion, permits the motion to be filed at a later time. Since defendant did not move for change of venue prior to trial, or at any subsequent time, she has failed to properly preserve this argument for appellate review. *See* N.C. R. App. P. 10(b)(1).

**[2]** Next, defendant argues that the trial court erred by not ordering a special venire *ex mero motu*. N.C.G.S. § 15A-958 provides: "Upon motion of the defendant or the State, or on its own motion, a court may issue an order for a special venire of jurors from another county if in its discretion it determines the action to be necessary to insure a fair trial." N.C.G.S. § 15A-958 (2001). For the following reasons, we conclude that the trial court did not abuse its discretion by not ordering a special venire.

Defendant claims that because of pretrial publicity, she was not able to receive a fair and impartial trial. She states that eight of the twelve jurors who were actually seated on the jury had obtained information relative to the case through the media. She also complains that jurors who were seated in the case heard from other prospective jurors during *voir dire* facts about the case and their feelings about the case based upon what they heard in the media.

However, each juror about whom defendant complains indicated that he or she would be fair and impartial and decide the case on the evidence that was presented. Also, the jurors indicated that they would disregard any information they heard or read prior to the trial.

Furthermore, with regard to two of the jurors about whom defendant complains, defendant had no objection and specifically stated that these jurors were acceptable. After reading the transcripts and considering the arguments by the State and defendant, we are not persuaded that the pretrial publicity prevented defendant from receiving a fair trial from jurors in the county in which the case was tried. We therefore conclude that the trial court did not abuse its discretion by not ordering a special venire in this case. This assignment of error is overruled.

**[3]** Defendant next contends that the short-form murder indictment violated her constitutional rights on the grounds that it failed to allege all the elements of first-degree murder. *See Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999). However, this Court has repeatedly addressed and rejected this argument. *See, e.g., State v. Braxton*, 352 N.C. 158, 173-75, 531 S.E.2d 428, 437-38 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Defendant has presented no compelling reason for this Court to reconsider the issue in the present case. Accordingly, this assignment of error is overruled.

**[4]** Next, defendant argues that the trial court erred by granting the prosecutor's motion for joinder of the murders and related charges regarding the victims Susan Moore and Tracy Lambert and the charges regarding Debra Cheeseborough. However, defendant has not cited to any place in the transcript or record where she made a motion for severance, and this Court has not found any such motion.

Pursuant to N.C.G.S. § 15A-927(a), a defendant must make a motion for severance of offenses before trial unless the basis for the motion is a ground not previously known. Under such a situation, the defendant may move for severance during trial but no later than the close of the State's evidence. Defendant waives his right to severance "if the motion is not made at the appropriate time." N.C.G.S. § 15A-927(a)(1) (2001). "If a defendant's pretrial motion for severance is overruled, he may renew the motion on the same grounds before or at the close of all the evidence. Any right to severance is waived by failure to renew the motion." N.C.G.S. § 15A-927(a)(2). Furthermore, as this Court has previously stated,

> [j]oinder is a decision which is made prior to trial; the nature of the decision and its timing indicate that the correctness of the joinder must be determined as of the time of the trial court's deci-

sion and not with the benefit of hindsight. While this rule may seem severe and, perhaps, highly prejudicial to an accused, our statutes provide a method by which an accused may protect against prejudice to his defense.

*State v. Silva*, 304 N.C. 122, 127-28, 282 S.E.2d 449, 453 (1981) (citation omitted).

In the instant case, not only did defendant fail to renew a motion for severance, but she also failed to make a motion for severance at any time before, during, or after the trial. Therefore, defendant's assignment of error is without merit.

[5] Next, defendant argues that the trial court erred in leaving the bench during a recess in jury selection proceedings. Defendant contends that during the time the judge was off the bench, a member of the media spoke with prospective juror Richard Council, who eventually was seated on the jury, and therefore deprived defendant of a fair trial. We disagree.

The court reporter recorded the following events which form the basis of defendant's argument:

THE COURT: And, Madam Clerk, would you go ahead and call another juror please for number five.

THE CLERK: Richard Council.

THE COURT: Thank you.

Counsel, I have to make a phone call to my district attorney. If you'll give me just a moment, please.

(Judge left the courtroom.)

(Number five, Mr. Council, entered the courtroom.)

THE BAILIFF: Sir, come on up and have a seat in number five.

(A male media representative was talking to the juror, Mr. Council, as the juror walked by.)

THE REPORTER: Tell that guy to quit talking to the juror, that media guy.

(Bailiff, Sgt. David Farrell, directed number five, Mr. Council, in the box after Sgt. Farrell spoke to the media representative.)

**STATE v. WALTERS**

[357 N.C. 68 (2003)]

(The judge returned to the courtroom.)

THE COURT: Remain seated.

THE BAILIFF: Come to order. Court's in session.

Defendant contends that the juror's actions and those of the media member were a direct violation of a 1 May 2000 order of the trial court regarding media access.

However, defendant has cited no authority to this Court that would lead us to conclude that the trial court erred in leaving the bench. Furthermore, even assuming *arguendo* that it was error, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial.

Defendant has provided no evidence that the media member said anything to prospective juror Council that would prejudice her case. Also, defendant provided no evidence that Council said anything in response to the media member's "comment." The transcript shows only that the bailiff immediately interrupted any inappropriate contact between prospective juror Council and the media member.

On a final note, defendant included plain error as an alternative in her question presented. "[T]his Court has held that plain error analysis applies only to jury instructions and evidentiary matters." *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39-40 (2002), *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 795 (2003).

Therefore, we conclude that defendant has failed to show prejudice as to this specific issue, and these assignments of error are overruled.

[6] Defendant next contends that the trial court erred by denying defendant's challenge for cause of prospective juror Kathrene Boxwell, thereby causing defendant to exercise a peremptory challenge. Defendant argues that Boxwell, who had previously managed an adult entertainment facility, was involved in litigation in which the business was forced into receivership. The defense attorney in the instant case, along with his wife, were attorneys involved in this prior litigation. Boxwell acknowledged remembering the defense attorney and his wife. Defendant also contends that Boxwell knew Tracy Lambert when they were employed at the same establishment. Furthermore, defendant argues that Boxwell had knowledge of this case from the print media.

However, we conclude from reading the transcripts that defendant used only thirteen of her fourteen peremptory challenges. N.C.G.S. § 15A-1214(h) provides:

(h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:

    (1) Exhausted the peremptory challenges available to him;

    (2) Renewed his challenge as provided in subsection (i) of this section; and

    (3) Had his renewal motion denied as to the juror in question.

N.C.G.S. § 15A-1214(h) (2001); *see also State v. Call,* 349 N.C. 382, 402, 508 S.E.2d 496, 509 (1998). Also, " '[t]he statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review.' " *State v. Goode,* 350 N.C. 247, 257, 512 S.E.2d 414, 420 (1999) (quoting *State v. Sanders,* 317 N.C. 602, 608, 346 S.E.2d 451, 456 (1986)).

In this case, the transcript reveals that defendant did not exhaust all of her peremptory challenges, and defendant also acknowledges that she did not seek additional peremptory challenges. Therefore, defendant has not met the requirements of N.C.G.S. § 15A-1214(h) in order to preserve this issue for appellate review. Furthermore, once again, defendant included plain error as an alternative in her question presented, but she does not specifically argue or give support in her brief as to why plain error is appropriate. Therefore, we will not address this part of her argument. *See Grooms,* 353 N.C. at 66, 540 S.E.2d at 723; *see also* N.C. R. App. P. 10(c)(4).

[7] Alternatively, defendant claims that her defense counsel's failure to challenge the three remaining prospective jurors for cause (Richard Council, Virginia Brazier, and Patricia Geroux) or to assert an additional peremptory challenge rose to the level of ineffective assistance of counsel. However, defendant provided this Court with no authority or support for this ineffective assistance of counsel claim. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited,

will be taken as abandoned." N.C. R. App. P. 28(b)(6); *see also State v. Lloyd*, 354 N.C. 76, 87, 552 S.E.2d 596, 607 (2001). Accordingly, the assignments of error presented in this issue are overruled.

[8] In defendant's next question presented, she argues that the trial court erred in denying her motion for disclosure of Rule 404(b) evidence to be introduced by the State and that the trial court erred in allowing cross-examination of defendant about certain prior bad acts.

First, there is no requirement that the State must provide a defendant with Rule 404(b) evidence that it intends to use at trial. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2001). As this Court stated in *State v. Payne*, "[t]his rule addresses the admissibility of evidence; it is not a discovery statute which requires the State to disclose such evidence as it might introduce thereunder." 337 N.C. 505, 516, 448 S.E.2d 93, 99 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Furthermore, in the instant case, just as in *Payne*, "the State did not directly introduce or use evidence of prior crimes or bad acts committed by defendant; rather, it cross-examined defendant about the act." *Id.* Thus, defendant's motion was properly denied.

As stated above, defendant also contends that the trial court erred in allowing cross-examination of defendant about certain prior bad acts. The following occurred during the prosecutor's cross-examination of defendant:

Q. Did you say your dad almost killed a boy that you stabbed?

A. I haven't stabbed no boy.

Q. Did you say that?

A. No, ma'am. I don't remember saying anything like that.

Q. Do you remember saying the boy you stabbed was 20-something at the time?

A. Unless the person who wrote this was talking about when I had a boyfriend who was trying to take my shirt off and I sliced him with a box cutter but that's not stabbing.

The trial court then excused the jury in order to question the prosecutor about the purpose of the preceding questions. During this questioning, the court asked defense counsel why he had not objected, and defense counsel stated the following:

Well, because we didn't care at the point she was at.

. . . .

. . . So far what she's asked her, she said she doesn't remember saying it. As long as she doesn't remember saying it, then—I mean I am assuming they can't prove it by extrinsic evidence because she has denied saying it until she tries to use those records to prove something that she said by extrinsic evidence, we really don't care. I mean she is welcome to keep asking her these things. If she remembers them, fine. If she doesn't, fine. As long as she doesn't get into saying, Well, didn't you say on such and such a date to Dr. So and So, then more power to them.

At this point, the judge brought the jury back into the courtroom, and the questioning resumed.

Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure provides that "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make." N.C. R. App. P. 10(b)(1). In the instant case, the trial court specifically asked defense counsel whether he wanted to object, and defense counsel stated that he had no problem with the questioning at that point in time. Thus, defendant has failed to properly preserve this issue for appellate review. *See, e.g., State v. Call*, 353 N.C. 400, 426-27, 545 S.E.2d 190, 206-07, *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001).

Defendant also contends that the trial court's alleged error amounted to plain error. This Court has previously stated that

the plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error

which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted) (emphasis in original), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Thus, in our review of the record for plain error, "defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result." *State v. Jones*, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002). After reviewing the record and transcripts as a whole, we conclude that defendant has not established any alleged prejudicial error on the part of the trial court that was so fundamental that the jury would have reached a different result absent the foregoing testimony. Accordingly, we find no plain error.

[9] Next, defendant argues that the trial court erred by admitting evidence from the hotel room in Myrtle Beach, South Carolina, where defendant was apprehended. Specifically, defendant contends that the evidence was obtained through an illegal search and seizure in violation of defendant's state and federal constitutional rights.

However, we have not found, nor has defendant cited, to any place in the transcript or record where she filed a motion to suppress this evidence prior to trial. Moreover, defendant has not cited to any place in the transcript where she objected to the introduction of this evidence at trial. Thus, defendant has failed to properly preserve this issue for appellate review. *See* N.C. R. App. P. 10(b)(1). Furthermore, "[c]onstitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *Lloyd*, 354 N.C. at 86-87, 552 S.E.2d at 607; *see also State v. Anthony*, 354 N.C. 372, 389, 555 S.E.2d 557, 571 (2001), *cert. denied*, 536 U.S. 930, 153 L. Ed. 2d 791 (2002).

Finally, defendant, in her question presented, asserts plain error as an alternative. However, defendant has not specifically argued or given support in her brief as to why plain error is appropriate in this situation. Rule 28(b)(6) provides that "[a]ssignments of error not set out in the appellant's brief, or in support of which no reason or argu-

ment is stated or authority cited, will be taken as abandoned." N.C. R. App. P. 28(b)(6); *see also Lloyd*, 354 N.C. at 87, 552 S.E.2d at 607. Thus, we will not address this aspect of defendant's contention.

**[10]** Defendant next contends that the trial court erred when it overruled defendant's objection to the prosecutor's cross-examination of defendant about a statement made by defendant to Detective Jo Autry.

During the State's case-in-chief, the prosecutor presented evidence that, after defendant's arrest, she gave a statement to Fayetteville Police Officer Chris Corcione. Officer Corcione testified that defendant stated that she had shot Debra Cheeseborough, that Eric Queen had shot Tracy Lambert, and that Francisco Edgar Tirado had shot Susan Moore.

When defendant took the stand during her case-in-chief, defense counsel asked her whether she had given another statement after giving the statement to Officer Corcione. Defendant responded that she had given another statement to Detective Jo Autry in which defendant said that she had *not* shot Debra Cheeseborough. Defendant testified that the statement given to Detective Autry was false and that she made it because she "was scared" and "wanted to go home." Defense counsel subsequently objected to the prosecutor's cross-examination of defendant about the statement to Detective Autry. In response to this questioning, defendant testified, as she did on direct examination, that she had lied in her statement to Detective Autry. She also stated that she did not remember exactly what she had said in her statement to Detective Autry. Defendant claims that the trial court erred by allowing this testimony because the prosecutor's questioning was improper under N.C.G.S. § 8C-1, Rule 803(5), the recorded recollection exception to the hearsay rule. We disagree.

It is clear from the transcript that defendant testified during her own defense that she gave two statements regarding the shooting of Debra Cheeseborough. In the first statement, given to Officer Corcione, defendant said that she shot Cheeseborough. In the second statement, given to Detective Autry, defendant said that she did *not* shoot Cheeseborough. Defendant then testified on direct examination by her own attorney that the second statement was false. This was the exact same testimony that the prosecution elicited on cross-examination. Thus, defendant was the one who placed this testimony into evidence. This Court has previously held that

the law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

*State v. Albert,* 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981); *see also State v. McKinney,* 294 N.C. 432, 435, 241 S.E.2d 503, 505 (1978). While we make no judgment as to whether this testimony would have been otherwise inadmissible, it is clear to this Court that defendant introduced this evidence. Therefore, since defendant "opened the door" to this testimony, the prosecutor was entitled to question defendant about this evidence. Thus, defendant's assignment of error is overruled.

**[11]** In defendant's next question presented, she argues that the trial court erred in overruling defendant's objection to the admission of a portion of a prior statement by Ione Black made to Detective Autry and portions of Black's telephone call to a 911 operator. Specifically, defendant contends that this evidence was inadmissible hearsay under N.C.G.S. § 8C-1, Rule 801(d)(E); the evidence was inadmissible 404(b) evidence; and the evidence violated the rule of *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476 (1968).

During the State's case-in-chief, Ione Black testified to the events leading up to and surrounding the murders and attempted murder. Black testified that when she returned home after the murders and attempted murder, she was scared because she knew that a couple of the people in the "gang" knew that she did not want to be there when the crimes occurred, and therefore, Black was afraid that these people might be looking for her. Next, when people in the "gang" actually did come to Black's house looking for her, Black told Carol Morrison, with whom she was living at the time, to tell them that she had gone to her mother's house. Dennis Jordan, Morrison's boyfriend, told the "gang" that Black had gone to her mother's house.

Next, Black testified that after the "gang" left her house, she was "really scared" because she had never seen "anybody get shot," and she "didn't really know any of the people that were involved in this and [she] just felt like they might try to do something to [her] because [she] didn't show up for the meeting" at defendant's trailer after the incidents. Later that evening, Black called 911 and told the operator

that she had "seen some people get shot," and she described a couple of the people who were involved in the incidents. Defendant then objected to the 911 tape being played to the jury on the grounds that the tape was unduly prejudicial because it contained a statement by Black that "[t]hey might have killed them boys too." Outside the presence of the jury, Black told the judge that she asked Tameika Douglas why they had to kill the women. Douglas responded by saying, "[T]hat wasn't s— because [Douglas] shot somebody last week." Black stated that she had heard on the news about a guy being shot a few days earlier, and she thought that might be what Douglas was referring to. After hearing this, the trial court overruled defendant's objection, stating that this evidence "is highly probative of the state of mind of the declarant, Ms. Black, at the time" and also that the evidence was "corroborative of her earlier testimony."

Along with the 911 tape, defendant objected to a portion of Detective Autry's testimony in which she testified to a statement given to her by Black. Specifically, defendant objected to that part of Black's statement where "she asked [Douglas] why they wanted to kill [the women]. [Black] state[d] that [Douglas] said, 'This ain't s—. A few days ago, I shot a man.' [Black] state[d] [Douglas] told her they had done this before." In overruling defendant's objection to this portion of the statement, the trial court stated that Black's statement to Detective Autry was

> substantially consistent, in the Court's opinion, with the sworn testimony of Ione Black given here in open court and that the variations are such that they can be argued to the jury. The jury can make its own determination as to whether or not specific aspects of the statement are consistent or in conflict with Ms. Black's statement [sic] but that there is not enough variation for the Court to require a redaction in the interest of fairness, in the Court's opinion.

Subsequently, Detective Autry was allowed to read Black's statement to the jury. For the following reasons, we conclude that defendant's objections are without merit.

As the trial court correctly noted, the foregoing 911 tape and the statement by Black to Detective Autry were admissible for the purpose of corroborating Black's earlier testimony at trial. It has been well established in this state that "[a] prior consistent statement of a witness is admissible to corroborate the testimony of the witness whether or not the witness has been impeached," even though the

statement was hearsay. *State v. Jones*, 329 N.C. 254, 257, 404 S.E.2d 835, 836 (1991); *see also State v. Rose*, 335 N.C. 301, 321, 439 S.E.2d 518, 529, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994), *and overruled on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001). Furthermore, this Court has held that:

> In order to be admissible as corroborative evidence, a witness' prior consistent statements merely must tend to add weight or credibility to the witness' testimony. Further, it is well established that such corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates.

*State v. Farmer*, 333 N.C. 172, 192, 424 S.E.2d 120, 131 (1993) (citations omitted). Moreover, "[i]f the previous statements are generally consistent with the witness' testimony, slight variations will not render the statements inadmissible, but such variations . . . affect [only] the credibility of the statement." *State v. Martin*, 309 N.C. 465, 476, 308 S.E.2d 277, 284 (1983). Thus, we conclude that the 911 tape and Ione Black's statement to Detective Autry were properly admitted to corroborate her earlier testimony and that any variation goes to her credibility. Therefore, the assignments of error presented under this issue are overruled.

Defendant also alleges that this testimony violated *Bruton*, 391 U.S. 123, 20 L. Ed. 2d 476. "In *Bruton*[,] the United States Supreme Court held that at a joint trial, admission of a statement by a nontestifying codefendant that incriminated the other defendant violated that defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *State v. Evans*, 346 N.C. 221, 231, 485 S.E.2d 271, 277 (1997) (citing *Bruton*, 391 U.S. at 126, 20 L. Ed. 2d at 479), *cert. denied*, 522 U.S. 1057, 139 L. Ed. 2d 653 (1998). Furthermore,

> [t]he principles set out in *Bruton* apply only to the extrajudicial statements of a declarant who is unavailable at trial for full and effective cross-examination. *Nelson v. O'Neil*, 402 U.S. 622, 29 L. Ed. 2d 222 (1971). Where the declarant takes the stand and is subject to full and effective cross-examination, a codefendant implicated by extrajudicial statements has not been deprived of his right to confrontation.

*Evans*, 346 N.C. at 232, 485 S.E.2d at 277.

In the instant case, defendant was tried alone, not jointly. Also, the declarant, Ione Black, took the stand and was available for a "full and effective cross-examination." Thus, the rule in *Bruton* has no applicability to the facts of this case. Therefore, this argument is without merit.

[12] Defendant also contends that the trial court committed reversible error or, in the alternative, plain error, in its instructions regarding mitigating and aggravating circumstances. Specifically, defendant contends that the trial court's charge and written instructions to the jury as to mitigating and aggravating circumstances in the two cases were erroneous because they contradicted the "Issues and Recommendation as to Punishment" forms submitted. Furthermore, defendant argues that the trial court's charge and instructions resulted in a misleading conclusion as to mitigating and aggravating circumstances and supporting evidence, thereby denying defendant due process, a fair trial, and legal and constitutional rights guaranteed by the United States Constitution and the North Carolina Constitution. We disagree.

Despite defendant's claim that the jury instructions were erroneous, defendant made no objection. After the trial court gave the jury its instructions, both parties were given an opportunity to object.

> THE COURT: . . . Before sending the original issues and recommendation form to the jury and allowing the jury to commence their deliberations, I will now consider any requests for corrections to the charge or any additional matters any attorney feels is necessary or appropriate to submit a proper and accurate charge to the jury.
>
> Are there any specific requests for corrections or additions? What says the state?
>
> [PROSECUTOR]: Nothing, Judge.
>
> THE COURT: What says the defense?
>
> [DEFENSE COUNSEL]: None, your Honor.

After the jury began deliberations, it requested that the judge "give [it] the instructions specifically applying to mitigating values for issue two, questions eight through 23, versus mitigating circumstances in questions one through seven." Outside the presence of the jury, and in the presence of counsel, the judge proposed the following oral instructions:

I would propose to instruct the jury that it is not for the court to instruct them as to values. That if they find mitigating circumstances one through seven exist, if any one or more of them finds it that they are to consider such statutory mitigating circumstance and that they—if they find that any of the circumstances numbered eight through 23 exist and find those to be mitigating, that they are to consider those, but that any value to be placed on any particular circumstance is for the jury to determine.

. . . .

THE COURT: . . . In regard to the court's oral instructions, as I've just stated, do you have any objection with the wording of those instructions?

[DEFENSE COUNSEL]: No, your Honor.

Defendant had yet another chance to object to the judge's instructions to the jury with regard to Issue Two. Written copies of the judge's instruction relating only to Issue Two on mitigating circumstances were given to the jury. Before the written instructions on Issue Two were given to the jury, the judge said, "And with regard to the substance of the instructions, I understand there's no objection. Is that correct, counsel?" Defendant's counsel answered, "That's correct, your Honor." Defendant had several opportunities to object to the judge's instructions, but failed to do so.

Because defense counsel did not object to this sentencing instruction at trial, this assignment of error is barred by Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure. *State v. Neal*, 346 N.C. 608, 620, 487 S.E.2d 734, 742 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998). "A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict . . . ." N.C. R. App. P. 10(b)(2). Because defendant failed to properly preserve this issue on appeal, we may review it only for plain error. *See* N.C. R. App. P. 10(c)(4); *State v. Hardy*, 353 N.C. 122, 131, 540 S.E.2d 334, 342 (2000), *cert. denied*, 534 U.S. 840, 151 L. Ed. 2d 56 (2001). As noted previously, "defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result." *Jones*, 355 N.C. at 125, 558 S.E.2d at 103.

Defendant argues that the trial court's instructions "did not distinguish [the] difference in how the jury should determine the mitigating *value* or *weight* of statutory versus non-statutory mitigating

circumstances." (Emphasis added.) Defendant uses the terms "value" and "weight" interchangeably. This Court has previously addressed the inappropriate interchangeable use of "value" and "weight." *State v. Davis*, 349 N.C. 1, 506 S.E.2d 455 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). We take this opportunity to reiterate the distinction between "value" and "weight." "The term 'value' is found only in the statutory catchall provision, N.C.G.S. § 15A-2000(f)(9), and has also only been applied to nonstatutory mitigating circumstances. The term 'weight' or 'weighing' is used only in N.C.G.S. § 15A-2000(b)(2) and [(c)(3)] referring to the process of weighing the mitigating circumstances found against the aggravating circumstances found." *Id.* at 51, 506 S.E.2d at 483.

First, we will deal with "value." This Court in *State v. Jaynes*, 342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996), maintained that by virtue of distinguishing between statutory and nonstatutory mitigating circumstances, "[t]he General Assembly has determined as a matter of law that statutory mitigating circumstances *have* mitigating value." (Emphasis added.) This simply means that only one or more of the jurors have to find by a preponderance of the evidence that one of the factual circumstances in N.C.G.S. § 15A-2000(f)(1) through (f)(8) exists. Once one or more of the jurors find that one of the factual circumstances in N.C.G.S. § 15A-2000(f)(1) through (f)(8) exists, that circumstance has mitigating value. In other words, the statutory mitigating circumstance that the jury found lessens defendant's culpability for committing the crime. Contrary to defendant's assertion, the General Assembly's determination does not require jurors "to *find* value as to statutory mitigating circumstances, as in the case of nonstatutory mitigating circumstances." *Davis*, 349 N.C. at 55, 506 S.E.2d at 485. (Emphasis added.) "Value" becomes a part of the analysis only when the jury determines whether the statutory catchall or nonstatutory mitigating circumstances exist. *Id.* Upon submission of a nonstatutory mitigating circumstance, at least one juror must find that the circumstance exists. Having done so, the juror must also find that the circumstance has value before it becomes part of the weighing process. Therefore, the trial court is not required to instruct the jury that statutory mitigating circumstances have value as a matter of law. As such, "value" should not be a consideration when the jury is considering statutory mitigating circumstances.

"Weight" becomes relevant only once the jury has found statutory and nonstatutory mitigating circumstances. *See* N.C.G.S.

§ 15A-2000(c)(3) (2001). Jurors do not use or find "weight" when considering whether a statutory or nonstatutory mitigating circumstance exists. Once the jury has found a statutory or nonstatutory mitigating circumstance, it weighs that and any other mitigating circumstances found against the aggravating circumstances found. *See id.* To summarize, "value" deals only with nonstatutory and the statutory catchall mitigating circumstances and applies to the process of determining the existence of the submitted circumstance, whereas "weight" is for balancing mitigating circumstances found against aggravating circumstances found.

Having reiterated the distinction between "value" and "weight," we will now deal with these concepts in their proper context with respect to the trial court's jury instructions as to Issue Two. For each of the seven statutory mitigating circumstances submitted, the trial court instructed the jury as follows:

> If one or more of you finds by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form.

> If none of you find the circumstance to exist, you would so indicate by having your foreperson write "no" in that space.

Here, the trial court instructed the jurors to write "yes" in the space provided if one or more of them found by a preponderance of the evidence that a particular statutory mitigating circumstance existed. The trial court did not specifically explain to the jury that the seven circumstances applicable to the aforementioned instruction are statutory mitigating circumstances. However, the trial court did not need to do so because once the jury found that one or more statutory mitigating circumstances existed, that circumstance indeed mitigated the crime or lessened defendant's culpability for the crime and would be weighed against the aggravating circumstances found. By virtue of the process through which the trial court guides the jury, if the jury finds that a statutory mitigating circumstance exists, that circumstance by implication has to have "value" because it lessens the defendant's culpability for the commission of the crime. Thus, the jury did not have to *give* the statutory mitigating circumstance value, and value was not a consideration. The jury simply wrote "yes" below the statutory mitigating circumstance listed on the form if the jury found it to exist by a preponderance of the evidence.

For the nonstatutory mitigating circumstances, the trial court instructed the jury as follows:

Now, ladies and gentlemen, you should also consider the following circumstances arising from the evidence *which you find to have mitigating value.*

Now, if one or more of you finds by a preponderance of the evidence that any of the following circumstances exist and *also are deemed by you to have mitigating value,* you would so indicate by having your foreperson write "yes" in the space provided.

(Emphasis added.)

In contrast to the trial court's instructions for statutory mitigating circumstances, the trial court's instructions for nonstatutory mitigating circumstances required an extra step. Once the jury found a nonstatutory mitigating circumstance by a preponderance of the evidence, it then had to determine if that nonstatutory mitigating circumstance had value. With a nonstatutory mitigating circumstance, the jury's finding of the facts supporting the existence of the circumstance does not automatically give the circumstance "value." The jury had to further determine whether or not that nonstatutory mitigating circumstance had value. Once again, the trial court's failure to specifically mention the word "nonstatutory" in its instruction is of no effect. The process the trial court's instructions required the jury to follow comports with the two-step process necessary to determine if a nonstatutory mitigating circumstance should have been considered. For a nonstatutory mitigating circumstance, even if a jury finds the factual basis for the circumstance to exist by a preponderance of the evidence, the jury must deem that circumstance to have mitigating value before it lessens defendant's culpability for the commission of the crime.

Distinguishing "value" with regard to statutory and nonstatutory mitigating circumstances is inherent in the trial court's instructions. Once the jury finds that a statutory mitigating circumstance exists, it is automatically considered in the weighing process by the jury writing "yes" on the issues and recommendation form. However, once a nonstatutory mitigating circumstance is found, it is only considered in the weighing process if the jury deems it to have mitigating value. Therefore, there is no need for the trial court to specifically state the distinction between statutory and nonstatutory mitigating circumstances with respect to "value."

Defendant argues that the trial court "made no distinction as to the weight to give statutory mitigating circumstance[s] and non-statutory mitigating circumstances." It is not necessary for the trial court to make a distinction between statutory and nonstatutory mitigating circumstances when referring to "weight." Giving "weight" to statutory or nonstatutory mitigating circumstances as distinct concepts is an improper application of the law. N.C.G.S. § 15A-2000(c)(3) provides that once a jury finds a mitigating circumstance or circumstances, it must show that "the mitigating circumstance or circumstances [found] are insufficient to outweigh the aggravating circumstance or circumstances found." This statute does not make a distinction between statutory and nonstatutory mitigating circumstances when weighing them against aggravating circumstances. When the jury is considering "weight," all mitigating circumstances, whether statutory or nonstatutory, must be weighed against all aggravating circumstances. Thus, the trial court does not need to instruct the jury on how to weigh statutory mitigating circumstances versus nonstatutory mitigating circumstances because all mitigating circumstances are weighed against all aggravating circumstances.

After reviewing the record and transcripts, we conclude that the trial court did not commit error, much less plain error. This assignment of error is overruled.

**[13]** Next, defendant argues that her trial attorney rendered ineffective assistance of counsel at trial in violation of the Sixth Amendment to the Constitution of the United States. We disagree. Defendant failed to provide transcript references under the assignment of error. N.C. R. App. P. 10(c)(1) provides that "[a]n assignment of error is sufficient if it directs the attention of the appellate court to the *particular error* about which the question is made, with *clear* and *specific* record or transcript references." (Emphasis added.) Defendant identifies the "Entire Transcript" as the basis for the assignment of error alleging ineffective assistance of counsel, as contained in the record on appeal. As there are 3,285 transcript pages in this case, a reference to the entire transcript is not a reference to a "particular error", nor is it "clear and specific." *See id.* Given that defendant's assignment of error does not comport with the mandate of N.C. R. App. P. 10(c)(1), the ineffective assistance of counsel argument is not properly before this Court. Therefore, this assignment of error is overruled.

**[14]** In defendant's next question presented, she contends that the trial court erred in denying her motion to exclude two photographs,

exhibit H1 and H8, depicting Susan Horne and Tracy Lambert. We disagree and will discuss each photograph in turn.

Exhibit H1 is a "close-up facial view of . . . Susan Moore." The photograph shows "some blood on the face and . . . a fly on the left closed eyelid of the victim[.] . . . [U]nder the victim's head appears to be tire tracks and the victim's left hand appears to have blue fingernail polish. No other part of the victim's body can be viewed except the left hand and the front area of the head and face." Defendant argues that this exhibit was "unduly inflammatory" specifically concerning the fly on the victim's eyelid. In finding that exhibit H1 is "highly probative, material and relevant and that the danger of unfair prejudice does not outweigh the high probative value," the trial court stated:

> [T]his photograph is highly probative, . . . finding that the position of the body is a material fact in the case and that the location of the head on what appears to be a tire track is consistent with testimony given by one of the state's witnesses who was allegedly present at the scene and witnessed the alleged murder.
>
> The court finds further that the amount of blood present is not excessive; that this is a fair and accurate representation based upon previous testimony that the court has witnessed of the body of the victim Susan Moore as it was observed by investigators who first arrived on the scene. That it is an identification photograph allowing witnesses who need to make an identification to do so. Based upon their knowledge of the identi[t]y of Susan Moore and their observation of the person at the scene of the alleged murder.
>
> [The court] finds that the presence in and of itself of what appears to be a fly on the left eyelid is not unduly prejudicial or inflammatory, the court taking as a matter of common sense and judicial notice that flies do not only pitch or light upon bodies, but that they are a constant irritant to people who are alive as well and that there is no significance to be attached to the presence of the fly.

"As a general rule, gory or gruesome photographs have been held admissible so long as they are used for illustrative purposes and are not introduced solely to arouse the passions of the jury." *State v. Warren*, 348 N.C. 80, 110, 499 S.E.2d 431, 448, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998). Furthermore, this Court has previously

stated that "[p]hotographs 'showing the condition of the body when found, its location . . . , and the surrounding scene at the time . . . are not rendered incompetent by the portrayal of the gruesome events which the witness testifies they accurately portray.' " *State v. Peterson*, 337 N.C. 384, 393-94, 446 S.E.2d 43, 49 (1994) (quoting *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982)), *overruled on other grounds by State v. Jackson*, 348 N.C. 644, 503 S.E.2d 101 (1998). Furthermore, " '[p]hotographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Watson*, 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984) (quoting *State v. Cutshall*, 278 N.C. 334, 347, 180 S.E.2d 745, 753 (1971)).

The decision of whether to admit photographs under N.C.G.S. § 8C-1, Rule 403 is "within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). In the instant case, the trial court properly exercised its discretion in admitting exhibit H1. This photograph was used to identify this particular victim, and it was used during the testimony of Officer Penny Goodwin to illustrate her testimony as to what she observed on 17 August 1998. Furthermore, the photograph was not so gruesome as to require its inadmissibility, and as the trial court found, the presence of the fly on the victim's eyelid did not change this outcome. Thus, applying the above principles and the requirements of N.C.G.S. § 8C-1, Rule 403, we conclude that the trial court properly admitted this evidence.

Next, with regard to exhibit H8, defendant argues that this photograph should have been held inadmissible because it was duplicative of exhibit H7. We disagree.

Exhibit H8 is a photograph of Susan Moore's and Tracy Lambert's bodies lying in a field. In admitting exhibit H8 into evidence, the trial court found that "while it does duplicate to some degree the state's exhibit H7, . . . H8 gives a different perspective, and the court finds it could be probative and valuable to the jury in determining . . . the relative positions of the bodies one to another and the relative positions of the bodies to a tree as a point of reference." The trial court also found "that there is nothing unduly prejudicial or gory about the picture."

"Repetitive photographs may be introduced, even if they are revolting, as long as they are used for illustrative purposes and are not aimed solely at prejudicing or arousing the passions of the jury." *Peterson*, 337 N.C. at 394, 446 S.E.2d at 49. We conclude, as the trial court did, that this photograph was not unduly prejudicial or gruesome under N.C.G.S. § 8C-1, Rule 403, and furthermore, this photograph offered a different perspective than that which was offered by exhibit H7. Thus, the trial court did not err in admitting exhibit H8 into evidence.

**[15]** Next, defendant argues that the trial court erred in submitting the aggravating circumstance that the murders were especially heinous, atrocious, or cruel. *See* N.C.G.S. § 15A-2000(e)(9). We disagree.

Whether a trial court properly submitted the (e)(9) aggravating circumstance depends on the facts of the case. The capital offense must not be merely heinous, atrocious, or cruel; it must be especially heinous, atrocious, or cruel. A murder is especially heinous, atrocious, or cruel when it is a conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998), (citations omitted), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999). This Court has

identified three types of murders that would warrant the submission of the [especially heinous, atrocious, or cruel] aggravating circumstance. The first type consists of those killings that are physically agonizing for the victim or which are in some other way dehumanizing. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). The second type includes killings that are less violent but involve infliction of psychological torture by leaving the victim in his or her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. [162,] 175, 321 S.E.2d [837,] 846 [(1984)], and thus may be considered "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The third type includes killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond

that normally present in first-degree murder[s]." *Id.* at 65, 337 S.E.2d at 827.

*Lloyd*, 354 N.C. at 122, 552 S.E.2d at 627-28 (citation omitted) (fifth and sixth alterations in original). Furthermore, "[i]n determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravating circumstance, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *Flippen*, 349 N.C. at 270, 506 S.E.2d at 706 (quoting *Lloyd*, 321 N.C. at 319, 364 S.E.2d at 328).

Applying the principles above, we conclude that the evidence in this case was sufficient to support the submission of the (e)(9) aggravating circumstance to the jury. The evidence at trial tended to show that the two victims were forced into the trunk of their car at gunpoint while screaming and trying to escape. Then, for about an hour, defendant and others drove the car around while the two victims cried for help, begged not to be hurt, and asked their abductors what was going to be done to them. At some point during the ride, the car was stopped, and some of the other gang members took jewelry off of the victims at gunpoint. Eventually, the gang arrived at defendant's trailer with the two victims in the trunk. The trunk was opened again, and Susan Moore pled for their lives. She asked her abductors: "Well, what are you all going to do to us?" "Are you going to kill us?" "We don't know what y'all look like. Just let us go." One of the gang members then told her, "Shut up, b———," and the victims were then locked back in the trunk. The gang members then went into defendant's trailer. Finally, the gang returned outside and drove the victims to a "dirt road" that was about twenty minutes away from defendant's trailer. The gang pulled the victims out of the trunk. Queen held a gun to Tracy Lambert's head and said, "Well, I'm about to open this b———'s third eye." Lambert started to cry, saying, "Oh, my God, Susan. We're going to die. We're going to die. I don't want to die." Queen told Lambert to shut up and then shot her in the head. Moore, who was being held with a knife to her throat, begged the gang not to cut her in the throat, but to shoot her instead. Subsequently, Francisco Tirado shot Moore in the head.

The victims were subjected to at least an hour and a half of psychological torture by being trapped in the trunk of a car while pleading for their lives. The victims were also abducted at gunpoint and robbed of jewelry. Furthermore, Susan Moore was forced to witness

Tracy Lambert being shot in the head. We thus conclude that the evidence more than warranted the trial court's submission of the (e)(9) aggravating circumstance to the jury for both murders. This assignment of error is overruled.

**[16]** We turn once again to the all-too-familiar contention by a defendant that counsel for the State engaged in improper closing arguments. We note that this case was tried prior to our decision in *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97. However, *Jones* did not introduce into the parameters of proper closing argument any new requirements, but instead reiterated established principles long articulated by the laws of this state and by this Court's decisions.

In this case, the State presented three separate arguments to the jury at guilt-innocence and at sentencing. In the first two arguments, the district attorney and one of his assistants engaged in proper closing arguments focusing on the evidence, the law, and the issues before the jury. This is a compelling case based upon the evidence presented at trial, and it is inconceivable why the third argument made by another assistant district attorney was ever made. Little, if any, argument was made about the evidence, law, or issues. Instead, the argument consisted of a rambling, disjointed personal attack on defendant, filled with irrelevant historical references and name-calling. Examples of the prosecutor's name-calling follow:

> Ladies and gentlemen, you mean to tell me three people get shot in cold blood by a bunch of no working, no school going, heathen, murdering, low-lifes and nobody's supposed to get emotional?
>
> . . . .
>
> . . . The whole low-life, no working, unemployed group, every one of them is just as guilty.
>
> . . . .
>
> . . . Ladies and gentlemen of the jury, you got to learn how to recognize evil when you see it. . . . You got to learn how to stand up to evil, ladies and gentlemen of the jury. You have to learn how to stand up to evil.
>
> And that girl and that whole gang of them over there, just like this man said, evil, wicked and mean.
>
> . . . .

. . . You say she's not evil? You say she's not evil? You don't think so. Well, ladies and gentlemen of the jury, if you can't recognize evil, you will never recognize it.

*See State v. Smith*, 279 N.C. 163, 165-67, 181 S.E.2d 458, 459-60 (1971) (reversing defendant's rape conviction because of the prosecutor's "inflammatory and prejudicial" closing argument describing defendant as "lower than the bone belly of a cur dog"); *see also State v. Miller*, 271 N.C. 646, 659-61, 157 S.E.2d 335, 344-47 (1967) (holding that the prosecutor committed reversible error by, *inter alia*, calling defendants "storebreakers" and expressing his opinion that a witness was lying).

Furthermore, large portions of the argument consisted of matters that were totally extraneous to the decision being made by the jury and that violated several principles of closing argument set out previously by this Court. The effect of this argument is to take a case that appears rock solid on the evidence and law and that was twice ably argued to the jury and bring it perilously close to mandating reversal.

In reviewing this matter, however, we are constrained by the lack of objections by the trial attorneys for defendant (there was only one objection), the total lack of intervention by the trial judge, the limited number of questions presented to this Court on appeal, and defendant's failure to properly assign error.

We now turn to the issues raised by defendant. Our standard of review depends on whether there was a timely objection made or overruled, or whether no objection was made and defendant contends that the trial court should have intervened *ex mero motu*. If there is an objection, this Court must determine whether "the trial court abused its discretion by failing to sustain the objection." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106. Application of the abuse of discretion standard to closing argument requires this Court to first determine if the remarks were improper. *Id.* "Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.*

When defendant fails to object to an argument, this Court must determine if the argument was "so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Barden*, 356 N.C. 316, 358, 572 S.E.2d 108, 135 (2002).

In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

Defendant raises two issues regarding closing arguments, one in the guilt-innocence phase and one in the sentencing phase, respectively. When considering prejudice in a capital case,

special attention must be focused on the particular stage of the trial. Improper argument at the guilt-innocence phase, while warranting condemnation and potential sanction by the trial court, may not be prejudicial where the evidence of defendant's guilt is virtually uncontested. However, at the sentencing proceeding, a similar argument may in many instances prove prejudicial by its tendency to influence the jury's decision to recommend life imprisonment or death. We also point out that by its very nature, the sentencing proceeding of a capital case involves evidence specifically geared towards the defendant's character, past behavior, and personal qualities. Therefore, it is certainly appropriate for closing argument at the sentencing hearing to incorporate reasonable inferences and conclusions about the defendant that are drawn from the evidence presented. However, mere conclusory arguments that are not reasonable—such as name-calling—or that are premised on matters outside the record— such as comparing defendant's crime to infamous acts—do not qualify and thus cannot be countenanced by this or any other court in the state.

*Id.* at 134-35, 558 S.E.2d at 108.

**[17]** We first address the one portion of the argument to which there was an objection. Defendant argues that the trial court erred in failing to intervene *ex mero motu* when the prosecutor's grossly improper argument intended to invoke passion into the jury by comparing defendant to Adolph Hitler. Defendant improperly characterizes the argument here, as the trial court does not intervene *ex mero motu* when an objection is made. We reiterate that the proper standard of review when an objection is made is whether "the trial court

abused its discretion by failing to sustain the objection." *Id.* at 131, 558 S.E.2d at 106.

During closing arguments in the guilt-innocence phase, the prosecutor told the jury:

Over 50-some years ago, a man from England went to Germany to meet a fellow at a place called Berchtesgaden and he went over there to sign a peace treaty, and this man had a great big enormous picture window. Now, the man from England that looked out the window [was] named Neville Chamberlain, when he looked out the window, he saw a world of peace. He saw a world of harmony. And he signed a little piece of paper, just like the one that this defendant tried to pawn off on this district attorney right here, signed a little piece of paper with that man—that other man from Germany that looked out the window. And he said we're at peace. The man from England took a little piece of paper, went back home waving it to his folks, We have peace in our time. He had no idea that he was talking to a man that, before it was over, would be responsible for the deaths of 50 million people on every continent, every sea. He would be responsible for the death of over 50 million women and children. He had no idea that Adolph Hitler was going to turn out the way he did.

But, ladies and gentlemen of the jury, oh, he met his match later on. Because Neville Chamberlain didn't remain in office. A fellow named Winston Churchill took over. And you know what Winston Churchill told the fuhrer? We will fight you on the beaches. We will fight you in the air. We will fight you on land. We will never surrender.

And if these people have their way—they got up here political, economic, social and all that stuff, if they have their way, they will turn this county—this state and this country into a place of chaos.

[DEFENSE COUNSEL]: Your Honor, we object.

THE COURT: Overruled.

[PROSECUTOR]: That's what they'll do. Got 12 keys of life. The last few of which are money, mac and murder. If they have their way—you know that man that looked out that picture window, the German one, he wrote a book. He had a little book he wrote while he was in prison called "Mein Kampf" and he had a twisted

dream too just like these folks right here. And he didn't, I don't suppose, look evil to Mr. Chamberlain. Mr. Chamberlain's head probably wasn't screwed on right but Churchill's head was.

The State argues that defendant objected only to the portion of the prosecutor's argument that defendant's gang would "turn this county—this state and this country into a place of chaos" and did not object to the references to Adolph Hitler. It is apparent that defendant followed the prosecutor's argument and objected when the prosecutor tied his prior references to Hitler to defendant. Therefore, we conclude that defendant's objection was directed to the reference to Hitler as well as the statement tying defendant to Hitler, and thus we will review the argument based on an objection having been made.

The State further contends that this Court should apply by analogy the rule relating to admission of evidence: " '[T]he admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character.' " *State v. Hudson*, 331 N.C. 122, 151, 415 S.E.2d 732, 747-48 (1992) (quoting *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979)), *cert. denied*, 506 U.S. 1055, 122 L. Ed. 2d 136 (1993). In other words, the State argues that defendant's objection that was overruled should be waived because defendant did not object to subsequent portions of the prosecutor's argument relating to Adolph Hitler. However, the rule relating to the admission of evidence during the trial is not analogous to arguments allowed during closing arguments. Whereas it is customary to make objections during trial, counsel are more reluctant to make an objection during the course of closing arguments "for fear of incurring jury disfavor." *Jones*, 355 N.C. at 129, 558 S.E.2d at 105. Defendant should not be penalized twice (by the argument being allowed and by her proper objection being waived) because counsel does not want to incur jury disfavor. Therefore, defendant properly objected to the prosecutor's argument, and no waiver occurred by defendant's failure to object to later references to Hitler.

Because defendant properly objected to the closing argument, this Court must determine if "the trial court abused its discretion by failing to sustain the objection." *Id.* at 131, 558 S.E.2d at 106. As previously noted, the application of the abuse of discretion standard to closing arguments requires this Court to first determine if the remarks were improper. *Id.* "Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court."

*Id.* Defendant contends that the prosecutor's argument was improper. We agree. "[I]mproper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others." *Id.*

Defendant contends that the prosecutor made this argument to compare her and the Crips to Hitler and the Nazis. However, at the conclusion of the argument, the prosecutor's reasoning for this argument appears to be different. "Ladies and gentlemen of the jury, go back there and act with resolve. Go back there. Do like Winston Churchill when he stood up to Hitler. Do it like that. Stand up to evil. Go back there and find this person guilty of every single charge on that indictment." Thus, the purpose of the argument appears to be to get the jury to "stand up to evil" like Winston Churchill did to Hitler rather than to appease evil like Neville Chamberlain did.

While this Court in *Jones* stated that arguments "premised on matters outside the record" during closing arguments are inappropriate, *id.* at 135, 558 S.E.2d at 108, we do not completely restrict closing arguments to matters that are only within the province of the record, to the exclusion of *any* historical references. However, despite the *de facto* historical nature of any past event, this Court will not allow such arguments designed to inflame the jury, either directly or indirectly, by making inappropriate comparisons or analogies. In this case, even if the prosecutor's argument about Neville Chamberlain and Adolph Hitler and Winston Churchill was to illustrate appeasement, using Hitler as the basis for the example has the inherent potential to inflame and to invoke passion in the jury, particularly when defendant is compared to Hitler in the context of being evil. We conclude that the prosecutor's argument in this case was improper.

Now we must "determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* at 131, 558 S.E.2d at 106. Although the prosecutor's argument was improper, given the overwhelming evidence of defendant's guilt, it can hardly be said that the prosecutor's remarks "were of such magnitude that their inclusion prejudiced defendant." *See id.* In fact, this argument, coming when it did after two proper arguments by the district attorney and an assistant district attorney, most likely had little, if any, impact on the jurors' decision on the issue of guilt or innocence. Finally, in viewing the argument in its totality, it appears far more incomprehensible and dis-

jointed than powerful and persuasive. Thus, we must conclude that, although improper, the necessary showing of prejudice was not met.

[18] Next, defendant argues that the prosecutor made improper statements during closing arguments in the sentencing phase. Defendant failed to make any objections, so this Court must determine if the prosecutor's arguments were "so grossly improper that the trial court erred in failing to intervene *ex mero motu.*" *Barden,* 356 N.C. at 358, 572 S.E.2d at 135.

Defendant points to seven portions of the prosecutor's closing argument during the sentencing phase that defendant contends were so grossly improper as to require intervention by the trial court. Specifically, defendant argues that the prosecutor tried to prejudice the jury by referring to the jury's "solemn" duty to the victims to do justice and by referring to the jurors confronting the victims in the "hereafter." Contrary to defendant's contention and having reviewed the argument in context, we conclude that the prosecutor did not imply that the jury's duty was to sentence defendant to death under God's law. This Court has disapproved of contentions that state law-enforcement entities have been ordained by God and that resisting those entities is resisting God. *Call,* 353 N.C. at 419, 545 S.E.2d at 202; *State v. Cummings,* 352 N.C. 600, 628, 536 S.E.2d 36, 56 (2000), *cert. denied,* 532 U.S. 997, 149 L. Ed. 2d 641 (2001). However, in this case, the prosecutor neither argued nor implied that law-enforcement entities were ordained by God. Furthermore, the remarks were not a biblical argument, nor were they based improperly on religion. The statements constituted a request to "do justice" and a hypothetical reference to encountering the victims in the hereafter. While inappropriate, these comments do not merit intervention by the trial court *ex mero motu. See Call,* 353 N.C. at 419.

Furthermore, in making references to God, the prosecutor challenged defendant's direct testimony in the guilt-phase that she had "found God." The prosecutor's reference to God was also in response to social worker Joan Cynthia Brooks' testimony about defendant's complaint about her grandmother's religious emphasis. Defendant contends that the prosecutor argued that defendant should be willing to die under God's laws. We disagree. The prosecutor did not suggest or imply that the jury should sentence defendant to death under God's laws. The prosecutor's comments were in direct response to defendant's testimony in the guilt-innocence phase that she had "found God" and to the social worker's testimony in the sentencing

phase. *See, e.g., State v. Robinson*, 336 N.C. 78, 129-30, 443 S.E.2d 306, 332 (1994) (holding that the prosecutor's argument on drugs and race was in response to the defendant's expert, who testified that defendant's inner-city background was partially responsible for his criminal behavior), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

**[19]** The prosecutor also argued that defendant's mitigating circumstances were excuses for the murders committed and challenged the weight of defendant's mitigating circumstances. Defendant provides no support for her contention that the prosecutor "misled the jury from the law" by making these statements about defendant's mitigating circumstances. The prosecutor simply contended that the jury should not give weight to defendant's mitigating circumstances. *See, e.g., id.* at 129, 443 S.E.2d at 332 (holding that the prosecutor's remark that the defendant's mitigation evidence constituted an "evasion of responsibility" was "directed toward the weight that the jury should give to defendant's evidence"). This Court has repeatedly maintained that "[a] prosecutor is permitted to legitimately belittle the significance of . . . mitigating circumstances." *State v. Haselden*, 357 N.C. 1, 20, 577 S.E.2d 594, 606 (2003); *accord State v. Billings*, 348 N.C. 169, 186-87, 500 S.E.2d 423, 433-34 (quoting *State v. Basden*, 339 N.C. 288, 305, 451 S.E.2d 238, 247 (1994), *cert. denied*, 515 U.S. 1152, 132 L. Ed. 2d 845 (1995)), *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998).

**[20]** In addition, the prosecutor argued to the jury during the sentencing stage, "You know what was once written about people who harm children? 'And whosoever shall offend one of these little ones that believe in me, it is better that a millstone be tied about his neck and he be drowned in the depths of the sea.' " Defendant contends that this was grossly improper and that the trial court should have intervened *ex mero motu*. However, the prosecutor did not argue that the Bible commanded that defendant be put to death. Instead, he used the statement in question to respond to defendant's testimony that she did not want her children in the Davis Street environment. The prosecutor appears to have used this colloquy to amplify defendant's bad parenting and to attempt to eliminate any sympathy the defense might try to invoke with the jury because defendant had children. This is evidenced by the prosecutor's following argument:

> Do not delude yourself, ladies and gentlemen of the jury. Counsel will get up here and tell you how pitiful [defendant] is, and how by letting her live, she'll be able to see her children.

They'll be able to see—come visit their mother. Ladies and gentlemen of the jury, the last thing that you ought to think of this person as is a mother. That's the person that put her children out of the house for this motley crew.

This case does not involve the death of a child such that an interpretation could be drawn from this argument that defendant should die because she has harmed her children. Furthermore, the prosecutor does not directly or indirectly state that defendant should be executed for these crimes because the Bible says so. Although "[t]his Court has strongly cautioned against the use of arguments based on religion," *Barden*, 356 N.C. at 358, 572 S.E.2d at 135, we hold that the prosecutor's arguments in this case were not grossly improper and that they do not constitute reversible error by the trial court's failure to intervene *ex mero motu*.

As we have observed, this closing argument was made prior to our decision in *Jones*. However, let there be no mistake. It is the expressed intention of this Court to make sure *all* parties stay within the proper bounds of the laws and decisions of this Court relating to closing argument. The federal courts have consistently restricted closing argument, while our state jurisprudence has tended to give far greater latitude to counsel. There is a proper balance, and in *Jones*, we took great care to spell out the proper parameters. In this case, at one point in his argument, the prosecutor said, "I hope the judge doesn't put me in jail for my language . . . ." While not inclined in this case to go that far, we once again remind counsel for all parties that improper argument in flagrant disregard of the limits placed on closing argument can and must be enforced by the courts.

[21] Defendant also contends that the trial court erred by allowing the prosecutor to argue, during closing arguments at the guilt-innocence phase of the trial, that defendant failed to call John Juarbe, Tameika Douglas, and Francisco Tirado to the stand, which thereby impermissibly shifted the burden of proof to defendant to prove her case.

During closing arguments at the guilt-innocence phase of the trial, defense counsel stated:

We didn't take one or two words out of context. We didn't take a statement here and a statement there and pull a couple words out and try to confuse you and not show you the statement. Heck, we even brought Eric Queen in here, put him on the stand and tried to get him to talk to you. He invoked his Fifth

Amendment right which is his perfect right to do. End of story. We can't question him any more about that. We brought Darryl Tucker in here, put him on the stand and we asked him questions and he invoked his Fifth Amendment rights. Can't ask him questions any more. We did—we tried.

In sum, we've tried to be completely up front with you. We tried to let you hear the whole story of what happened in this incident. We tried to let you hear it without emotional tirades, without smoke in [sic] mirrors. We tried to let you have the bare, cold facts and let you decide what happened. It's as simple as that.

During the prosecutor's closing argument in rebuttal, the prosecutor responded to this argument by saying:

Now, the defense wants you to believe that they called in Mr. Queen, they called in Mr. Tucker because they were trying to show you everything and give you a chance to hear everything because they want to be real truthful with you and make sure you know everything. Well, were there any other defendants in this case?

You've got to wonder, now, let's see, what was this defendant's relationship to those two defendants? Well, when she was arrested, law enforcement tells you she comes out of the bedroom with Queen. She says in the statement you couldn't sleep with somebody in your same set, so she didn't have a relationship with Eric Queen. But she said on the stand, yeah, we were boyfriend—no, we weren't boyfriend and girlfriend but we had a sexual relationship. She comes out of the back bedroom there— by law enforcement, those two were in the back bedroom. She is so afraid of him. She is so afraid. She is so afraid she keeps his picture right beside her bed. She look like she is scared of anybody in that picture? Looks like they are on pretty good terms in that picture. Eric Queen—you reckon—you reckon Eric Queen is the boyfriend? He is the one that's caught in the bedroom with her when law enforcement catches her. You reckon there wouldn't be a chance he wouldn't unload on her if he did say anything if they put him on the stand? Probably wouldn't, would he? He's the boyfriend?

Now, who else on this chart would this defendant be close to? Well, she kept saying what? Couldn't throw Tucker out. His daddy was my O.G. [original gangster], plus he's fam. He's fam. Got to let

him stay there. Got to send the children away for days. I cannot have the children here. I can't do whatever. Can't throw out Tucker. Finally, she did. When he questioned her, you got to leave. Fam, brings him in. You reckon if he says anything, you can take that chance putting him on the stand, can't you, because if he says anything, she's close enough that he's not likely to hurt her, isn't he?

So why don't they put John Juarbe on the stand? Why didn't they call Tameika Douglas? Why didn't they call Paco [Tirado]? She was plenty ready to unload on Paco all the way through her testimony. If you put Paco up there, I wonder what he would have said. Put Carlos Frink, Carlos Nevills, think about it. The defendant chose to call up there the two people that, if they said anything, what? Were closest to her. Most unlikely to do what? Hurt her. Remember that. Remember that. Because the defendant has said to you how truthful she was, how she tried to show you everything.

Defendant first contends that the trial court committed plain error in this case by not intervening during this closing argument. However, this Court has stated that plain error review is appropriate only "when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence." *State v. Cummings*, 346 N.C. 291, 314, 488 S.E.2d 550, 563 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998). "Since defendant failed to object to these allegedly improper statements during the closing arguments, [she] 'must demonstrate that the prosecutor's closing arguments amounted to gross impropriety.' " *State v. May*, 354 N.C. 172, 178, 552 S.E.2d 151, 155 (2001) (quoting *State v. Rouse*, 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995)), *cert. denied*, 535 U.S. 1060, 152 L. Ed. 2d 830 (2002). " 'To establish such an abuse, defendant must show the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair.' " *Hyde*, 352 N.C. at 56, 530 S.E.2d at 294 (quoting *State v. Robinson*, 346 N.C. 586, 607, 488 S.E.2d 174, 187 (1997)). Furthermore, " '[t]rial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom.' " *Id.* (quoting *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999)).

Also, "[w]hile a prosecutor may not comment on the failure of the accused to testify, he may 'comment on a defendant's failure to produce witnesses or exculpatory evidence to contradict or refute evidence presented by the State.' " *State v. Skeels*, 346 N.C. 147, 153, 484 S.E.2d 390, 393 (1997) (quoting *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993)); *see also State v. Ward*, 354 N.C. 231, 261-62, 555 S.E.2d 251, 271 (2001); *State v. Fletcher*, 348 N.C. 292, 322, 500 S.E.2d 668, 685 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999); *State v. Morston*, 336 N.C. 381, 406, 445 S.E.2d 1, 15 (1994). " '[T]he jury, in weighing the credibility of the evidence offered by the State[] may consider the fact that it is uncontradicted . . . or unrebutted by evidence available to defendant.' " *State v. Tilley*, 292 N.C. 132, 143, 232 S.E.2d 433, 441 (1977) (quoting *State v. Bryant*, 236 N.C. 745, 747, 73 S.E.2d 791, 792 (1953)) (third alteration in original).

In the present case, we conclude that the prosecutor was merely arguing that defendant had witnesses available who could have offered exculpatory evidence but that defendant had refused to call those witnesses. Furthermore, we conclude that the prosecutor was also responding to defendant's assertion in which her attorney said to the jury, "We tried to let you hear the whole story of what happened in this incident." Therefore, we hold that the prosecutor's closing argument did not amount to gross impropriety, and thus, the trial court did not err by not intervening *ex mero motu.*

Defendant raises four additional issues that she concedes have been previously decided contrary to her position by this Court: (1) the trial court erred in allowing death qualification of the jury; (2) the N.C.G.S. § 15A-2000 (e)(9) aggravating circumstance that a murder is "especially heinous, atrocious, or cruel" is unconstitutionally vague and overbroad; (3) the trial court erred by instructing the jury during the capital sentencing proceeding that the answers to Issues One, Three, and Four on the "Issues and Recommendation as to Punishment" form for each case must be unanimous; (4) the trial court erred by failing to change the wording of Issue Three on the "Issues and Recommendation as to Punishment" form for each case to avoid a recommendation of death if the jury found the aggravating and mitigating circumstances to be of equal weight and value.

Defendant raises these issues in order to urge this Court to reexamine its prior holdings with regard to these issues. We have considered defendant's arguments, and we find no compelling reason to reverse our prior holdings. Therefore, the assignments of error presented under these issues are overruled.

**[22]** Having found no prejudicial error in defendant's trial or capital sentencing proceeding, we must now review and decide three issues: (1) whether the record supports "the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death"; (2) whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor"; or (3) whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). If this Court finds the existence of one of these factors, "[t]he sentence of death shall be overturned and a sentence of life imprisonment imposed in lieu thereof." *Id.*

After a thorough review of the record, transcript, briefs, and oral arguments, we hold that the record provides ample support for the jury's finding of all four aggravating circumstances submitted as to each murder: (1) the murder was committed while defendant was engaged in the commission of a first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); (2) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); (3) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (4) the murders for which defendant was convicted were part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We now turn to our final statutory duty of proportionality review. In conducting our proportionality review, we consider "whether the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). "[I]t is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate." *State v. Williams*, 355 N.C. 501, 590, 565 S.E.2d 609, 660 (2002), *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 808 (2003). This Court has found a death sentence disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d

396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373; *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any of the cases in which this Court has found the death sentence dispro- portionate. Defendant was convicted of two counts of first-degree murder both on the basis of premeditation and deliberation and under the felony murder rule with two underlying felonies—kidnap- ping and robbery with a firearm. This Court has recognized that "a finding of premeditation and deliberation indicates 'a more calcu- lated and cold-blooded crime.' " *State v. Harris,* 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee,* 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied,* 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Additionally, the largest number of aggravating circumstances found by the juries in the cases held disproportionate was two. However, in the case at bar, the jury found the existence of four aggravating circumstances.

The facts in the case at bar are similar, if not more egregious than the facts in *State v. Call,* 353 N.C. 400, 545 S.E.2d 190. In *Call,* defend- ant lured one murder victim into a remote cornfield and killed the vic- tim by hitting him in the head with a shovel and a tire iron. Defendant assaulted another victim by hitting him in the head with an aluminum bat and leaving him in the field all night. In the case at bar, both of the victims were violently kidnapped and were forced to ride in the trunk of their car, listening to plans to kill them. One of the two murder vic- tims watched as her friend was fatally shot in her presence. The other begged to be shot versus having her throat cut before she was shot in the head. The surviving victim was kidnapped at gunpoint. She was thereafter robbed and was forced to get into the trunk of her car. She was in the trunk when gang members gathered around the car and discussed what to do with her. Defendant and three others drove her to a remote area, where defendant shot her multiple times and then left her in a field to die. All three victims in this case endured an extended period of terror.

This Court in *Call* found defendant's death sentence proportion- ate where the jury found the same four aggravating circumstances as in this case: (1) the murders were committed while defendant was en- gaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5);

(2) the murders were committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); (3) the murders were especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (4) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). *See id.*

Accordingly, after reviewing the facts of this case and the treatment of other similar cases, we find the death sentence in this case to be proportionate.

NO ERROR.

Justice BRADY did not participate in the consideration or decision of this case.